## GUARDIANSHIP OF ABEL.

*November 16—December 5, 1911.*

*Guardianship: Allowance of attorney's fees: Appealable order.*

1. Where the parties consented that in and by the final order in a guardianship proceeding the circuit court should determine the amount of attorney's fees, if any, to be allowed for services to an incompetent person, but did not agree that such determination should be final or waive the right to appeal, an appeal lies from that part of the order.

2. No allowance should have been made, under the facts of this case, for services of attorneys on behalf of an incompetent person.

APPEAL from an order of the circuit court for Milwaukee county: LAWRENCE W. HALSEY, Circuit Judge. *Reversed.*

Albert F. Abel was an adopted son of John H. Abel. The latter died in 1901 leaving surviving his widow, *Catharine B.,* this adopted son, and an adopted daughter, now *Mrs. Adele Stewart.* He left a will devising the use, profit, and income of all his property to his widow during widowhood, and subject to this some legacies not relevant here, and 499 shares of stock in a corporation to his adopted son, and the residue, subject to the legacies and to the devise to his wife, to this adopted son and to the adopted daughter. The widow, entitled to the use of the income, and the two adopted children,

being of full age, consented to a sale of this corporate stock, and the proceeds of such sale remained in the hands of the executors in lieu of the shares of stock. The appraised value of the estate was slightly over $215,000, and the interest of Albert F. Abel therein worth $100,000, but he would come into possession and enjoyment only after the termination by death or marriage of the widow's right to the income. Up to 1905, when he was about twenty-six years of age, Albert F. Abel continued to live in the home of his foster-mother. He was shiftless and dissipated and addicted to the use of intoxicating liquors. During the next three years his habits became worse. On June 30, 1908, at the instance of his foster-mother and under the advice of the attorneys for the estate, he executed and delivered to her an assignment, absolute on its face, of all his interest in his foster-father's estate, and contemporaneously with this assignment a separate instrument signed by Albert and his foster-mother showing that the assignment was given only as collateral security for any and all loans and advances which she might thereafter make to him. He was required to report at the office of these attorneys at least once a week, and this he did up to July 18, 1910, receiving weekly sums from his foster-mother to aid him in providing for himself. Up to this time she had advanced him $607.25, about $65 thereof for clothing and the remainder in weekly sums of $5. He worked intermittently and earned a little money, and his dissipation and drunkenness increased to such an extent that he became mentally incompetent. On or about July 18, 1910, *Arthur H. Koenitzer,* an attorney who had known Albert for about ten years prior to that time, brought him into the office of *William L. Tibbs,* also an attorney at law. *Tibbs* applied to Walter A. Zinn, who was a friend or client of *Tibbs,* for a loan to Albert, and drew up and had executed by Albert and Mrs. E. A. Schroeter, a married sister of Zinn, an instrument dated July 22, 1910, reciting that Albert claimed certain interests in the estate of

John H. Abel, deceased, after the payment of certain legacies and on the termination of the life estate of the widow of said deceased, and desired to make a loan sufficient to secure him $10 per week during the continuance of the estate of said widow, and such further amount as might be necessary to secure and protect his rights in said estate, and agreeing that Mrs. Schroeter should advance $1,000 and leave the same with the Fidelity Trust Company of Milwaukee as trustee, to be paid out to Albert at the rate of $10 per week, with such further sums as the parties to the instrument might agree to be necessary to protect his interest in the estate, and also agreed to keep on deposit with the Fidelity Trust Company money sufficient to advance the $10 per week. Albert agreed, as the money was advanced, to execute and deliver to Mrs. Schroeter his promissory notes therefor bearing interest at the rate of ten per cent. per annum, compound interest, secured by an assignment of all his right in the estate. Mrs. Schroeter was a mere cover for Walter A. Zinn, who was the real party with Albert to this instrument. The writing did not bind Zinn. On the same day *Tibbs* drew up and he and *Koenitzer* witnessed an assignment by Albert of all his interest in this estate as security for the repayment of the money loaned and to be loaned and as security for the carrying out of the terms and provisions of said contract on the part of Albert. On the same day Albert, *Tibbs,* and *Koenitzer* executed an instrument in writing reciting the interest of Albert under the will in question and that he claimed the assignment to his foster-mother of his interest had been wrongfully and illegally procured from him and that he had a right of action against her to vacate and set aside this assignment and recover and secure his interest in the estate, and for the purpose of so doing desired to procure the legal services and assistance of *Koenitzer* and *Tibbs*. He therein covenanted to pay to the persons last named for such services one half of the amount of all money, assets, and property which might be

received or recovered from his foster-mother individually or as executrix of said will, and one half of the amount of all money, assets, and property to which he was then or at any time thereafter might become entitled as heir, legatee, or devisee under the will of John H. Abel, deceased. *Koenitzer* and *Tibbs* on their part agreed to commence and take such legal proceedings as might be necessary in order to set aside the assignment and to recover and secure the interest of Albert in and to the estate of John H. Abel, deceased. It was also covenanted that they should make no charge except that therein agreed on, and that no settlement should be made with Albert's foster-mother without the consent of each of said parties to this instrument. It further purported to give these attorneys a lien on the cause of action and on the proceeds thereof and upon Albert's interest in and to the estate of John H. Abel, deceased, to recover the amount which was therein agreed to be paid. On the 23d day of July, 1910, *Tibbs* further drew up and Albert signed a power of attorney appointing *Tibbs* and *Koenitzer* jointly his lawful attorneys for him and in his name, place, and stead to commence, maintain, and prosecute all necessary actions to vacate and set aside a pretended assignment to the widow dated June 30, 1908, of Albert's interest in the estate of John H. Abel, deceased, and to maintain and prosecute all other actions which might be necessary. This authorized the attorneys to adjust, compromise, and settle all controversies pertaining to the interest of Albert, to sign, seal, acknowledge, and deliver in his name all contracts of settlement, deeds, releases, assignments, conveyances, or other instruments that might be necessary in the adjustment and settlement of his interest in the said property. It further granted jointly unto these attorneys the right, power, and authority to negotiate for a sale or sales and to sell and dispose of all or any part of the right, title, and interest of Albert in said estate at and for such sums or amounts of money or property as the attorneys should deem

adequate and sufficient and to execute contracts of sale, deeds, etc., to carry this into effect. It further purported to secure compensation for services, legal or otherwise, agreed to be rendered, and sold or assigned and conveyed to said attorneys an interest in and to all of the interest of Albert in said estate and declared that the power of attorney was irrevocable. *Tibbs* also drew up and Albert signed another assignment to E. A. Schroeter of his interest in and to any and all contracts and agreements which he might have with the widow and the money and property to be received thereon and therefrom. This was dated July 22, 1910. On July 23, 1910, *Tibbs* further drew up and Albert signed another assignment selling, assigning, and setting over unto *Tibbs* and *Koenitzer* a one-half interest in and to all his right, title, and interest in this estate. These papers were sealed in an envelope and deposited with the Fidelity Trust Company with the following indorsement on the envelope:

"This envelope was this day deposited and left with the undersigned Trust Company by Albert F. Abel, he stating that the same contained a duplicate contract between himself and *William L. Tibbs* and *Arthur H. Koenitzer;* also power of attorney to same parties; also assignment, as security for the agreement of said contract; also contract between himself and E. A. Schroeter; likewise two assignments to E. A. Schroeter as security for the terms of said contract with said Schroeter."

There was also another indorsement as follows:

"Received of Albert F. Abel this 23d day of July, 1910, one envelope having indorsed thereon the following: 'This envelope was this day deposited and left with the undersigned Trust Company by Albert F. Abel, he stating that the same contained a duplicate contract between himself and *William L. Tibbs* and *Arthur H. Koenitzer;* also power of attorney to same parties; also assignment, as security for the agreement of said contract; also contract between himself and E. A. Schroeter; likewise two assignments to E. A. Schroeter as security for the terms of said contract with said Schroeter,' which said envelope is to be held for the said Albert F. Abel,

but the same, or the contents thereof, is not to be withdrawn or removed from the undersigned Trust Company, or shown to any third parties, unless by and with the consent and in the presence of each and all of the parties to said agreement, or their duly authorized attorneys or agents." Signed by the Fidelity Trust Company.

On September 16, 1910, *Mr. Tibbs* drafted and Albert executed his last will and testament, whereby he revoked former wills and gave, devised, and bequeathed to Walter A. Zinn all of his property and appointed Zinn sole executor without bond. In this will he recited that he contemplated guardianship proceedings being had over his person and property. In this will he also expressed a wish and desire that Zinn assign or turn over to *Koenitzer* and *Tibbs* all the money and property to which by virtue of the aforesaid contracts they would be entitled. Further directed that said contracts be carried out and performed by Zinn for and in his behalf.

Zinn advanced $1,200 to the Fidelity Trust Company as trustee. Albert went to the Keeley drink cure at Waukesha accompanied by *Mr. Koenitzer* on the day following the execution of the contracts and before making his will. Here he remained a month, when he was discharged for a violation of the rules. Upon his return Albert and *Koenitzer* lived five or six weeks in a camp a few miles north of the city. This brought them down to about the first week in September. About this time *Tibbs* employed *Mr. Rossiter Lines,* an attorney, as counsel or assistant in the prospective litigation against *Mrs. Abel.* On September 16, 1910, a summons and affidavit for examination of *Mrs. Abel* were drafted and served. On September 17th *Lines* filed a petition for the appointment of a guardian of Albert, reciting that the latter was twenty-nine years old and had no vocation, trade, or means of earning a livelihood, and that Albert then was and for more than five years had been addicted to the excessive use of tobacco and intoxicating liquors; his habits were ir-

regular and dissipated, and that as the result thereof his judgment and mental capacity had become so impaired that he then was and during the whole period of five years had been unable and incompetent to care for his person and estate; that Albert was sensible of such mental incapacity and incompetence and inability and desired a guardian appointed. It then describes his interest in the estate of John H. Abel, deceased, and avers that the widow of the latter, knowing the incompetency of Albert to make a valid contract, procured from him by undue influence, fraud, etc., a pretended assignment of Albert's right, title, and interest in the said estate, and that said pretended assignment was on file in the county court of Milwaukee county and could be used in a fraudulent and wrongful manner for the purpose of closing up the estate without notice to or the knowledge of Albert, who apprehended such fraudulent use would be made. This petition asked that the Fidelity Trust Company, a corporation, be appointed guardian of the person and estate of Albert. On the same day the Fidelity Trust Company consented to act, and an order was made by the circuit court appointing this trust company such guardian, and letters of guardianship were issued to it. Notice of examination served with the summons on September 16th was returnable on September 23d and a subpoena issued for *Mrs. Abel,* together with a notice to produce papers. The papers in this proceeding stated, among other things, that discovery was desired concerning the nature and contents of another paper or document made or executed in connection with said assignment to *Mrs. Abel.* No notice or demand of any kind was given to or made upon *Mrs. Abel* before the commencement of this suit.

On September 17th the attorneys for the Abel estate informed *Mr. Tibbs* of the fact that the assignment of Albert to his mother was not an absolute one nor claimed as such and that there was a defeasance, and requested *Mr. Tibbs* to

examine that instrument.    On the same day the attorneys for
the estate transmitted by writing to *Mr. Tibbs* copies of the
assignment to *Mrs. Abel* and of the contemporaneous collat-
eral agreement, with other information.    September 22d an-
other subpœna was issued for *Mrs. Abel* with a like notice to
produce, but was served on Mr. Gehrz, one of the attorneys
for the estate.    On September 23d the examination under
sec. 4096, Stats. (Laws of 1909, ch. 84), for the purpose of
enabling the plaintiff to plead began, Albert appearing by
*Tibbs* and *Koenitzer,* and *Mr. Tibbs* conducting the examina-
tion.    This examination was continued until September 26th,
again until September 27th, when it was resumed and con-
cluded.    The collateral agreement was here again produced,
and *Mrs. Abel* stated that she was willing to cancel the assign-
ment to her upon repayment to her of $607.25, the amount
she had advanced under that assignment and collateral agree-
ment.    Nothing further was done in this suit against
*Mrs. Abel,* no complaint served or filed, but the suit was con-
tinued from time to time by stipulation.

On October 6th the mother and sister by adoption of Al-
bert petitioned the county court for the appointment of a
guardian of the person and estate of Albert, and said matter
was set for hearing in the county court on the first Tuesday
of November.    At about the same time they petitioned the
circuit court to vacate the appointment of the Fidelity Trust
Company as guardian, and this was by order to show cause
returnable October 8, 1910.    Affidavits were presented in these
proceedings.    On October 25, 1910, a writ of *certiorari* was
issued by the circuit court to the county court to bring up the
matter in the latter court for the appointment of a guardian
for Albert.    On February 2, 1911, Albert having become
reconciled to his foster-mother and sister, and *Koenitzer,*
*Tibbs,* and *Lines* having expressed their willingness to sur-
render up all the contracts mentioned, the circuit court, hav-
ing all these matters before it, and the Fidelity Trust Com-

pany praying to be relieved of its guardianship aforesaid, by consent of parties took up all these matters in the Matter of the Guardianship of Albert F. Abel and discharged the Fidelity Trust Company as guardian and appointed *John J. Maher* in its stead. It also by the same order vacated the appointment by the county court, allowed the guardian's account, and ascertained and fixed the amount of other liabilities. *Koenitzer, Tibbs,* and *Lines,* the Fidelity Trust Company, Zinn, and Schroeter in this proceeding surrendered up the will of Albert and all contracts with Albert to the circuit court, and all parties agreed that the court should cancel up those contracts, the will, power of attorney, etc., and ascertain and fix the attorney fees, if any, of the several attorneys engaged in this matter. The parties were unable to agree on the amount of attorney fees which should be awarded to *Koenitzer, Tibbs,* and *Lines,* and evidence was offered on both sides bearing on this question. The circuit court made an order disposing of all such matters, and one portion of this order fixed the attorney fees last mentioned at $5,000, and from that part of this order an appeal is taken by Albert by his general guardian, *John J. Maher.*

The respondents offered themselves as witnesses and claimed compensation for six days' services in court and two hundred and fifty days in preparation and drafting papers. *Koenitzer* "figured" that he devoted eighty-five days to looking after Albert at the Keeley cure and in the camp and looking up law, without discriminating between services as an attorney at law and those of an attendant or companion. *Lines* spent sixty-four days in office work and six days in court. *Tibbs* devoted one hundred and one days to the matter, six or seven days of which were in court. It is apparent that no such amount of time was necessary and there is no proof that it was necessary in the case.

For the appellant there were briefs by *Austin, Fehr & Gehrz,* and oral argument by *G. G. Gehrz.*

For the respondents there was a brief by *William L. Tibbs,*
*Rossiter Lines,* and *A. H. Koenitzer, in pro. per.,* and oral
argument by *Mr. Lines* and *Mr. Tibbs.*

TIMLIN, J.    The final order in a special proceeding is by
statute appealable.    The parties hereunto consented that in
and by this order in the matter of the guardianship of Albert
F. Abel the circuit court should ascertain and determine the
amount of attorneys' fees, if any, to which respondents might
be entitled, but did not agree that the finding on this subject
should be conclusive or waive their right of appeal.    We
cannot, therefore, dismiss this appeal.    Upon the foregoing
showing no allowance should have been made to respondents.
On the merits of their claim *nostra tacita clamant.    Sæpe*
*tacens vocem verbaque vultus habet.    "Tacita quædam haben-*
*tur pro expressis."*

*By the Court.*—The order of the circuit court is reversed,
and the cause remanded with directions to disallow all com-
pensation to respondents.